JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 21-0532 JGB (SHKx)** | Date | November 29, 2023 |
|---|---|---|---|
| Title | ***Isalliah Brock v. Wells Fargo and Company, et al.*** | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   FINDINGS OF FACT AND CONCLUSIONS OF LAW
                  (IN CHAMBERS)

      In this Employment Retirement Income Security Act ("ERISA") action, Plaintiff Isalliah Brock ("Plaintiff") appeals the denial of a death benefit pursuant to Section 502(a)(1)(B), 29 U.S.C. § 1132 (a)(1)(B). Plaintiff seeks a death benefit under the terms of an Accidental Death and Dismemberment ("AD&D") Plan sponsored by her deceased fiancée's employer, Wells Fargo & Company ("Wells Fargo").

      On October 11, 2022, the parties each filed trial briefs. ("Plaintiff's Brief," Dkt. No. 47; "Defendant's Brief," Dkt. No. 46.) On November 1, 2022, the parties each filed responsive trial briefs. ("Plaintiff's Reply," Dkt. No. 48; "Defendant's Reply," Dkt. No. 49.) On November 4, 2022, Plaintiff filed a corrected responsive trial brief. ("Plaintiff's Corrected Reply," Dkt. No. 51.) On September 12, 2022, the Court approved the parties' stipulation that the standard of review applicable to Plaintiff's claims is de novo. (Dkt. No. 41.) On November 10, 2022, upon review of the parties' trial briefs and the Administrative Record, ("AR," Dkt. No. 45), the Court determined that argument was unnecessary for decision on the matter and vacated the bench trial scheduled for November 15, 2022. (Dkt. No. 53.)

//
//
//
//
//
//
//

## I. FINDINGS OF FACT[1]

"In bench trials, Fed. R. Civ. P. 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" Vance v. American Hawaii Cruises, Inc., 789 F.2d 790, 792 (9th Cir. 1986) (quoting Fed. R. Civ. P. 52(a)). "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision. This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions." Id. (citations omitted). The following constitutes the findings of fact based on the Administrative Record.

### A. Plan Terms

Plaintiff's fiancé, Ronnie R. Allmond Jr. ("Allmond"), was a participant in an AD&D Plan ("Plan," AR at 344) offered by his employer, Wells Fargo & Company, and insured by MetLife Insurance Company ("Defendant" or "MetLife"). (AR at 118, 121.) The Plan is governed by ERISA, 29 U.S.C. §§ 1001 et seq. (Id. at 118.) The Plan provides a death benefit in the event the insured "sustain[s] an accidental injury that is the Direct and Sole Cause of a Covered Loss." (Id. at 385.) Under the Plan, not all covered losses result in a payment of benefits. (Id.) In the section titled "Exclusion for Intoxication," MetLife states that it "will not pay benefits under this section for bodily injuries received while the insured person was operating a motor vehicle under the influence of alcohol as evidenced by a blood alcohol level ("BAC") in excess of the state legal intoxication limit" ("Exclusion Provision"). (Id. at 386.)

### B. Nevada's Driving While Intoxicated Law

Nevada Revised Statute 484C.110 states:

> 1. It is unlawful for any person who:
> (a) Is under the influence of intoxicating liquor;
> (b) Has a concentration of alcohol of 0.08 or more in his or her blood or breath; or
> (c) Is found by measurement within 2 hours after driving or being in actual physical control of a vehicle to have a concentration of alcohol of 0.08 or more in his or her blood or breath, [or] to drive or be in actual physical control of a vehicle on a highway or on premises to which the public has access.

Nev. Rev. Stat. § 484C.110(1).

//
//

---

[1] The Court has elected to issue its decision in narrative form because a narrative format more fully explains the reasons behind the Court's conclusions. Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

### C. Allmond's Death

On June 22, 2019, at approximately 6:06 a.m., Allmond was driving a 2016 red Dodge Challenger northbound on the IR 215 in Las Vegas, Nevada. (AR at 191, 194, 234.) Allmond's vehicle crossed the right paved shoulder and entered the right side of a prepared dirt area. (Id. at 191.) The vehicle continued in a northeast direction and entered the right side of a rock landscape area. (Id.) The front right side of the vehicle struck a concrete bridge embankment, the vehicle continued in a northeast direction, and then the vehicle overturned. (Id.) The vehicle came to rest on its left side. (Id.)

Allmond was removed from the vehicle by fire department personnel and air lifted to the University Medical Center ("UMC") Trauma Emergency Room where life saving measures were conducted. (Id. at 191, 234.) Blood was collected at UMC at 7:14 a.m. (Id. at 274.) Mr. Allmond was pronounced deceased at 8:29 a.m. on the same day of the crash. (Id. at 191.)

### D. The Autopsy and Death Certificate

The blood collected at UMC was transported to the Clark County Coroner's ("Coroner") office in Las Vegas, Nevada by an investigator and received along with Allmond on June 22, 2019 at 10:05 a.m. (Id. at 274.) The blood was "stored in a chain of custody envelope" in the Coroner's refrigerator until a postmortem examination was performed on June 23, 2019 at 9:05 a.m, a little over 24 hours after Allmond's death. (Id.)

The postmortem examination of Allmond's body was performed by Forensic Pathologist Chiara Mancini ("Mancini"), D.O. (Id. at 236, 239.) Mancini concluded that Allmond died of blunt force injuries. (Id. at 239.) The death certificate also lists the sole cause of death as "multiple blunt force injuries" and the manner of death as "accident." (Id. at 32, 33.) The Coroner's office issued a "Report of Investigation" which states that an "[o]dor of alcohol emanat[ed] from person." (Id. at 235.)

During the postmortem examination, central and peripheral blood were collected. (Id. at 238.) The UMC blood samples as well as the additional samples collected during the postmortem exam were packaged up to be sent to the NMS toxicology lab. (Id. at 274.) The blood samples were picked up by the NMS courier on June 23, 2019 at 4:00 p.m. and sent to the lab via Fedex. (Id. at 206, 274.) The samples were received at NMS on June 25, 2019. (Id. at 274.) The samples were processed and tested immediately, and results were reported on July 5, 2019 at 9:01 p.m. (Id.)

### E. NMS Labs Toxicology Report

According to the NMS Labs Toxicology Report ("NMS Report"), ante-mortem blood collected in a lavender vial with no preservative on June 22, 2019 at 7:14 am, approximately 1.13 hours after the accident, was positive for: (1) ethanol- 83 mg/dl; and (2) blood alcohol concentration ("BAC") - 0.083 g/100 ml. (Id. at 155.) The ethanol and BAC analyses were

done by Headspace GC. (Id.) The NMS Report includes a reference comment that states "[e]thanol can also be a product of decomposition or degradation of biological samples." (Id. at at 110.)

**F. Nevada Highway Patrol Report**

The Nevada Highway Patrol ("NHP") issued a crash report ("NHP Report") that contains some documents with the watermark "draft" and other documents without that watermark. (Id. at 190-208.) A document that has the watermark "draft" states that Allmond "for reasons unknown" allowed his vehicle to cross the right paved shoulder of the IR 215. (Id. at 191.) A document that does not have any watermarks states that Allmond, while driving "recklessly, and under the influence of alcohol and marijuana, allowed" his vehicle to cross the right paved shoulder of the IR 215. (Id. at 194.)

The following information is from documents in the NHP Report that do not have any draft watermarks. An approximately half full bottle of Camarena Tequila was found in the debris field. (Id. at 206.) An approximately half full bottle of 1800 Silver Tequila was found in a gym bag in the debris field. (Id.) The speed limit for IR 215, the highway that Allmond was driving on, was 65 miles per hour. (Id. at 199.) At five seconds prior to the first impact, Allmond's vehicle was reported to be traveling between 126-127 miles per hour. (Id. at 203.) At 2.2 seconds prior to the impact, the vehicle was traveling at 130 miles per hour. (Id.) At 1 second prior to the first impact, the vehicle was traveling at 107 miles per hour. (Id.) "Weather conditions did not appear to be a contributory factor" in the crash. (Id. at 197.) "[R]oadway design, construction, highway conditions, and traffic control did not appear to be contributing factors" to the crash. (Id. at 199.)

The NHP Report states that the Coroner's office took blood samples, sent them to NMS Labs for a toxicological analysis, and NMS Labs reported that the blood samples showed a BAC of 0.083%. (Id. at 206.) The NHP Report concluded that Allmond's BAC level was "likely contributory" to the car crash. (Id.)

**G. Plaintiff's Claim for Benefits and MetLife's Denial**

Following Allmond's death, Plaintiff filed a claim for life and voluntary AD&D benefits in July 2019. (Id. at 46.) On August 17, 2021, MetLife denied the claim for AD&D benefits and asserted that Allmond's death fell within the Exclusion Provision because the NMS Report provided a BAC of 0.083% which is above the Nevada 0.08% legal limit for operating a motor vehicle. (Id. at 118-119.) MetLife concluded that because Allmond was intoxicated while operating a motor vehicle at the time of the crash, the Exclusion Provision applies and there are no benefits payable under Plaintiff's claim. (Id. at 119.)

//
//
//

### H. Plaintiff's Appeal

On October 9, 2020, Plaintiff submitted her appeal of MetLife's claim denial decision ("Appeal"). (Id. at 160.) In her appeal, Plaintiff asserted that there are two main reasons why MetLife should reverse its decision: (1) the integrity of the ante-mortem blood sample analyzed by NMS Labs was breached; and (2) the ante-mortem blood sampled analyzed by NMS Labs was misused. (Id. at 164.) Plaintiff asserted that based on those two issues the NMS Report's findings are unreliable and insufficient, and thus, cannot be used as evidence to support MetLife's conclusion that Allmond's blood alcohol level was above 0.08% at the time of the crash. (Id.)

In support of her position, Plaintiff submitted an expert report by Dr. William R. Sawyer, PhD, D-ABFM, ("Sawyer") titled "Estate of Ronnie Allmond, Jr., Toxicological Assessment" ("Sawyer Report"), as well as a copy of his curriculum vitae. (Id. at 222-231.)

Sawyer identified various alleged issues with the forensic investigation of Allmond's BAC level including: (1) chain of custody of the antemortem specimens; (2) sample collection vial and bacterial contamination/fermentation of blood sample; (3) reliability of central venous blood from catheter as opposed to peripheral venous venipuncture; (4) inappropriate use of clinical biological specimen for forensic drug testing; and (5) ethanol production in vitro. (See Sawyer Report.)

In response to the Appeal, on November 4, 2020, MetLife requested a chain of events/custody from the Coroner's office in regards to "the blood sample that was taken on the decedent from when it was taken up until when the results were determined." (AR at 251.) On November 12, 2020, the Coroner's office responded to MetLife with an eleven-point procedure for specimen collection that ends when a courier mails the specimen box to NMS via fed ex. (Id. at 257.) MetLife described the Coroner's response as "a general explanation of their process; that's not what we need, we need the specific timeline with step by step on this person's blood sample testing/handling, and an explanation how the BAC was derived." (Id. at 265-66.) On December 8, 2020, MetLife followed up with the Coroner's office and requested more specific information. (Id. at 269.) On December 9, 2020, the Coroner's office responded with the following:

> In regards to the specific time line for the decedent Ronnie Allmond, on June 22nd 2019 at 0605 the decedent was involved in a single motor vehicle collision with a concrete embankment. At that time he was transported by life flight to UMC. Blood was collected at UMC trauma at that time, with a collection date and time of 6/22/0219 at 0714. The hospital admission blood was transported to our office by an investigator and received along with the decedent on 6/22/2019 at 1005. The hospital admission blood was stored in a chain of custody envelope in our refrigerator until the exam was performed. The exam for this case was performed the following day 6/23/2019 at 0905. At that time the hospital blood samples as well as additional samples that were collected at the time of exam were packaged up to be sent to our toxicology lab NMS. The samples were picked

>up by the NMS courier on 06/23/2019 at roughly 1600 and sent to the lab via Fed ex. Specimens were received at N MS on 6/25/2019. Processing and testing begins immediately and results were reported on 07/05/2019 at 2101. As far as how the BAC is derived you will need to contact NMS Labs to discuss their testing process.

(Id. at 274.)

On January 12, 2021, MetLife upheld the denial of Plaintiff's claim after it "re-examined the entire claim file, including examination of any additional material and information provided with [Plaintiff's] request for appeal." ("Appeal Denial," Id. at 285.) MetLife stated that it "reached out and confirmed the chain of custody of the sample" and that it "verified the testing methods used therein." (Id.)

On March 26, 2021, Plaintiff filed a complaint in this Court for failure to provide plan benefits under ERISA against defendants Wells Fargo and MetLife. ("Complaint," Id. at 307.)

## II. CONCLUSIONS OF LAW

### A. Standard of Review

Under ERISA, a beneficiary or plan participant may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (2006). The Court reviews benefits denials de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits"; if the plan does grant such discretionary authority, the Court reviews the administrator's decision for abuse of discretion. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Salomaa v. Honda Long Term Disability Plan, 637 F.3d 958, 965 (9th Cir. 2011). Here, the parties agree that the controlling standard of review is de novo. (Dkt. No. 41.)

A court employing de novo review in an ERISA case "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006). Under de no review, the Court "accords no deference to the plan administrator's decision." Collier v. Lincoln Life Assurance Co. of Bos., 53 F.4th 1180, 1186 (9th Cir. 2022). "The district court must base its decision on the administrative record and may supplement the record only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." Id. (internal quotes omitted).

Plaintiff "bears the burden of proving her entitlement to benefits under the policy." Cerone v. Reliance Standard Life Ins. Co., 2014 WL 10706760, at *7 (S.D. Cal. Aug. 8, 2014). However, because MetLife denies benefits pursuant to a policy exclusion, MetLife has the burden of showing that an exclusion applies. Dowdy v. Metro. Life Ins. Co., 890 F.3d 802, 810 (9th Cir. 2018). In reviewing the Administrative Record, "the Court evaluates the

persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010).

### B. Discussion

Because the Court applies de novo review, no deference is given to the claim administrator's decision, and the Court merely evaluates the persuasiveness of each side's case and determines if Plaintiff has adequately established that she is entitled to recovery under the Plan. The primary factual issue is whether Allmond was driving under the influence of alcohol at the time of the accident. The primary legal issue is whether the BAC procedure and outcome was properly relied upon by MetLife.

Here, MetLife bears the burden to show that Allmond's injuries were sustained while "operating his motor vehicle under the influence of alcohol as evidenced by a BAC in excess of the state legal intoxication limit." (Exclusion Provision.) Plaintiff does not dispute that MetLife has the right to deny benefits to individuals who fall under the Exclusion Provision, nor does Plaintiff dispute that the relevant state intoxication limit is 0.08%. (Defendant's Brief at 13; see Plaintiff's Brief.) Plaintiff only contends that the 0.083% BAC result was inaccurate. (Plaintiff's Brief at 17.) Plaintiff relies entirely on the Sawyer Report for this contention. (See Plaintiff's Brief.) The Sawyer Report contains speculations, assumptions, and scientific discussion about blood testing generally—it fails to indicate any verifiable evidence that Allmond's procedure was improper or that his BAC was anything other than 0.083%. (See Sawyer Report; see also Defendant's Brief at 15-17.)

Plaintiff argues that MetLife has not met its burden of proof because it did not provide evidence to refute the contentions raised in the Sawyer Report. (Plaintiff's Brief at 17.) This reasoning is grounded in the premise that MetLife did not sufficiently investigate the claim before it denied it. (Plaintiff's Brief at 17-22.) However, the Court's task now is to determine, without deference to MetLife's allegedly procedurally flawed decision whether MetLife's denial of benefits was appropriate. Vaught v. Scottsdale Healthcare Corp. Health Plan, 2009 WL 10678165, at *2 (D. Ariz. Oct. 19, 2009).

MetLife considered the following reports in its determination:

1. Postmortem Examination (AR at 236-39);
2. NHP Crash Report (Id. at 194-208);
3. Clark County Coroner's Report of Investigation and Autopsy Report (Id. at 233-39);
4. Toxicology Report from NMS Labs (Id. at 240-42).

These reports were all conducted by neutral third-party entities. (Defendant's Brief at 13.) The Coroner's office used its designated toxicology lab, NMS Labs, and confirmed that it followed its standard protocol for the collection and storage of the blood samples. (Id. at 2.) Allmond's police, autopsy and toxicology reports determined that his BAC was 0.083%. (See AR

at 194-242.) Based on these reports, and the fact that there were no irregularities raised within the original reports or by the agencies responsible for the reports, MetLife found that the Exclusion Provision applied to Plaintiff's case. (Defendant's Brief at 13-14.)

Undisputed evidence beyond Allmond's BAC level supports this conclusion. Allmond was driving at 130 mph, double the posted speed limit, with two open containers of tequila in his car. (AR at 206.) The NHP determined that the accident occurred while Allmond was "under the influence of alcohol and marijuana." (Id. at 194.) When the Coroner examined Allmond, he noted that there was an "[o]dor of alcohol emanating from person." (Id. at 235.) The NHP Report concluded that Allmond's BAC level was "likely contributory" to the car crash. (Id. at 206.)

MetLife contends that its reliance on the BAC level reflected in the toxicology report was justified and appropriate based on the facts of this claim and that MetLife correctly applied the Exclusion Provision. (Id. at 2.) The Court agrees and finds that MetLife's denial of benefits to Plaintiff was proper. Accordingly, the Court **AFFIRMS** MetLife's denial.

### III.  CONCLUSION

Based on the findings of fact and conclusions of law above, the Court concludes that the Exclusion Provision applies to Plaintiff's claim. Accordingly, the Court **AFFIRMS** MetLife's decision to deny Plaintiff's Plan benefits. The Clerk is directed to close the case.

**IT IS SO ORDERED.**